UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
ACACIA GONZALEZ,

                    Plaintiff,

        -against-

INGE THERON, FACEGYM NY LLC, and
FACEGYM USA INC.,

                  Defendants.
---------------------------------------------------------X

**Case No. : 20-cv-3854**

**COMPLAINT**

***Jury Trial Demanded***

PLAINTIFF ACACIA GONZALEZ (hereinafter referred to as "Plaintiff"), by her attorney Goddard Law PLLC, whose offices are located at 39 Broadway, Suite 1540, New York, NY 10006, alleges upon knowledge with respect to herself, and upon information and belief as to all other matters, as follows:

### PRELIMINARY STATEMENT

1.     This is an action to remedy unlawful discrimination, harassment, and wrongful termination based on Plaintiff's race and national origin discrimination and retaliation in violation of the New York State Human Rights Law ("NYSHRL") and New York City Human Rights Law ("NYCHRL").

2.     This is also an action to seek Plaintiff's unpaid wages under the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL")

3.     Plaintiff seeks declaratory relief, monetary, and punitive damages.

### JURISDICTION

4.     Jurisdiction of the Court over this controversy is based upon 29 U.S.C. § 201, *et. seq*, 28 U.S.C. §§ 1331 and 1337 and the doctrine of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

5.      This Court has jurisdiction over all state law claims brought in this action pursuant to 28 U.S.C. § 1367.

6.      This action properly lies in the Southern District of New York, pursuant to 28 U.S.C. § 1391.

7.      All conditions precedent to filing the instant action have been fulfilled.  On or about September 25, 2019, Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").  On February 19, 2020, Plaintiff received a Notice of Right to Sue.  This action is being brought within 90 days of Plaintiff's receipt of her Notice of Right to Sue.

## PARTIES

8.      Plaintiff is a Hispanic female citizen of the United States who resides in New York, New York. Plaintiff was subject to race and national origin discrimination that resulted, ultimately, in her unlawful termination from Defendant FaceGym NY, LLC and Defendant FaceGym USA, Inc. (hereinafter collectively referred to as "Defendants")

9.      Plaintiff is and was, at all times relevant herein, Defendants' "employee" within the meaning of all relevant State and local laws, including, but not limited to, Title VII, the Fair Labor Standards Act, New York State Human Rights Law, the New York Labor Law and the New York City Human Rights Law.

10.      Plaintiff expressed her consent to make the FLSA claims against Defendants by signing a written consent form, pursuant to 29 U.S.C. § 216(b).  *See* Ex. A.

11.      Upon information and belief, Defendant FaceGym NY, LLC was and is a foreign limited liability company registered in Delaware and permitted to do business in New York. Upon information and belief, Defendant FaceGym NY, LLC has locations in the Saks Fifth

Avenue Store located at 611 5th Ave, New York, NY 10022 and at 670 Broadway, New York, New York, 10012.

12.     At all times hereinafter mentioned, the activities of Defendant FaceGym NY, LLC constituted an "enterprise" within the meaning of Section 3(r) & (s) of the FLSA, 29 U.S.C. § 203(r) & (s).

13.     Upon information and belief, Defendant FaceGym NY, LLC maintained control, oversight, and direction over their operations and employment practices.

14.     At all times hereinafter mentioned, Defendant FaceGym NY, LLC employed employees, including Plaintiff, who regularly engaged in commerce or in the production of goods for commerce or in handling, selling or otherwise working on goods and materials which have moved in or been produced for commerce within the meaning of Section 3(b), (g), (i) and (j) of the FLSA, 29 U.S.C. § 203(b), (g), (i), (j), (r) & (s).

15.     Defendant FaceGym NY, LLC's annual gross volume of business is more than $500,000 within the meaning of 29 U.S.C. § 203(s)(A)(ii).

16.     At all relevant times, Defendant FaceGym NY, LLC maintained control, oversight, and direction over its employees, including Plaintiff.   Amongst other things, Defendant FaceGym NY, LLC maintained timekeeping, payroll and other employment practices that applied to them.

17.     Upon information and belief, at all times herein, Defendant FaceGym USA, Inc. is a domestic corporation registered and permitted to do business in New York. Upon information and belief, Defendant FaceGym USA, Inc. has locations in the Saks Fifth Avenue Store located at 611 5th Ave, New York, NY 10022 and at 670 Broadway, New York, New York, 10012.

18.     At all times hereinafter mentioned, the activities of Defendant FaceGym USA, Inc. constituted an "enterprise" within the meaning of Section 3(r) & (s) of the FLSA, 29 U.S.C. § 203(r) & (s).

19.     Upon information and belief, Defendant FaceGym USA, Inc. maintained control, oversight, and direction over their operations and employment practices.

20.     At all times hereinafter mentioned, Defendant FaceGym USA, Inc. employed employees, including Plaintiff, who regularly engaged in commerce or in the production of goods for commerce or in handling, selling or otherwise working on goods and materials which have moved in or been produced for commerce within the meaning of Section 3(b), (g), (i) and (j) of the FLSA, 29 U.S.C. § 203(b), (g), (i), (j), (r) & (s).

21.     Defendant FaceGym USA, Inc.'s annual gross volume of business is more than $500,000 within the meaning of 29 U.S.C. § 203(s)(A)(ii).

22.     At all relevant times, Defendant FaceGym USA, Inc. maintained control, oversight, and direction over its employees, including Plaintiff.   Amongst other things, Defendant FaceGym USA, Inc. maintained timekeeping, payroll and other employment practices that applied to them.

23.     Upon information and belief, at all times herein, Defendant Inge Theron (herein after "FaceGym Founder Theron") was and is the Chief Executive Officer ("CEO") of Defendant FaceGym NY, LLC., and FaceGym USA, LLC, and maintained an office at Defendants' address listed in the preceding paragraph, and was Plaintiff's highest-level supervisor.

24.     Defendants are and were, at all times relevant herein, Plaintiff's "employer" within the meaning of all relevant State and local laws, including, but not limited to Title VII, the

Fair Labor Standards Act, New York State Human Rights Law, the New York Labor Law and the New York City Human Rights Law.

25.     Plaintiff demands a jury trial.

## STATEMENT OF FACTS

## FACTUAL BACKGROUND

26.     Upon information and belief, Defendants provide facial "workouts" and "exercises" that are a "workout" for the face, which they describe as promoting "muscle toning" and "circulation" to their clients' faces.

27.     Upon information and belief, Defendants' salons, "FaceGym trainers" are trained to do "FaceGym "workouts," and perform these workouts on clients for various prices, ranging from approximately $70 to $340.

28.     Defendants' trainers are paid hourly, but also rely on tips from clients to supplement their salary. The more expensive the workout, the higher tip a trainer will receive.

29.     Upon information and belief, Defendants also provide their own line of makeup, including "foundations," which is colored makeup in various skin tones applied to the face. Upon information and belief, Defendants' foundation colors range from light-colored "Honey" to "Natural."

30.     Inge Theron, a journalist from England who was born in South Africa, is the Founder and CEO of Defendant ("Defendant Founder Theron").

### Plaintiff is Hired for Defendant' Saks Fifth Avenue Location

31.     In or about April 2018, Plaintiff was interviewed by Magdalena Nikolova, Regional Manager and Hiring Manager for Defendants' New York employees.

32.     Following the interview, in or about May 2018, Plaintiff was hired as a Front of House Manager/Assistant Manager at Defendants' Saks Fifth Avenue location. The Saks Fifth Avenue location was the first of Defendants' studios in New York City, its flagship studio, and therefore extremely high-profile.

33.     Plaintiff's direct supervisors were Supervisor Valerie Davis ("Supervisor Davis"), and COO Katherine Pye ("COO Pye").

34.     As the Front of House Manager, Plaintiff was responsible for scheduling appointments, checking clients in, and informing them of the trainer to which they were assigned.

35.     Plaintiff had first-hand knowledge into which trainers were assigned to which clients.

**Manager Weber is a Manager at Plaintiff's Salon**

36.     Strangely, Marketing Manager for Defendant, Ashley Weber ("Manager Weber"), who is a white woman, sat at the Saks Fifth Avenue salon for much of the day, even though her office workspace was at a separate location.

37.     Manager Weber scrutinized certain salon employees as they were working by, among other things, following their movements, walking behind them around the salon, and ordering the salon employees to do tasks.

38.     When Plaintiff inquired as to what Manager Weber's role was at the salon, Supervisor Davis told Plaintiff that she had better "watch out" around Manager Weber, because she was the "eyes and ears" at the salon for Defendant Founder Theron.

39.     Supervisor Davis told her that if anyone in the salon, including Plaintiff, failed to perform or had conflict with Manager Weber, Manager Weber would report this to Defendant Founder Theron, and they would be immediately be fired by Defendant Founder Theron.

40.     Because of this power, it was understood by Supervisor Davis, COO Pye, Plaintiff, and all of the employees of the salon that Manager Weber was a manager of the salon, in a higher position than Supervisor Davis and COO Pye.

### Defendants Failed to Pay Plaintiff all Her Earned Wages
### in violation of Federal and State Law

41.     In around May 2018, Plaintiff was hired as an hourly worker.  She was paid $17 an hour.

42.     Plaintiff was an employee of Defendants, working under their direct supervision.

43.     From around May 2018 to September 2018, Plaintiff typically worked 48 hours a week. Her typical schedule from around May 2018 to September 2018 was Monday to Saturday from 9:30 AM to 5:30 PM.  From around October 2018 to December 2018, Plaintiff typically worked 33 hours a week.

24.     At all relevant times, Plaintiff was required to be paid overtime pay at the statutory rate of one and one-half her regular rate of pay after he worked 40 hours in a workweek for Defendant.

44.     Defendant failed to pay her at her proper overtime pay rate of one and one-half her regular rate of pay for all hours she worked over 40 per week.

45.     Defendant failed to furnish Plaintiff with an accurate statement of wages listing hours worked, rates paid, gross wages, allowances and deductions taken, and net wages paid for each workweek.

46.     Also because of chronic under-staffing, Plaintiff was not permitted to take lunch breaks or rest breaks.

47.     Manager Weber and Supervisor Davis ordered Plaintiff not to take rest breaks and lunch breaks because the location was "too busy."

48.     When Manager Weber caught Plaintiff eating, she was scolded for doing so.

49.     Despite the fact that Plaintiff was forbidden to take breaks, Defendants automatically deducted pay hours for lunch and rest breaks from Plaintiff's paychecks.

50.     Defendants failed to pay Plaintiff for all hours worked up to forty each workweek.

**Manager Weber Creates a Hostile Work Environment for Minority Employees**

51.     As soon as Plaintiff started work at Defendant, Manager Weber created a hostile work environment for Plaintiff and for other minority employees, specifically minority trainers.

52.     Manager Weber scolded, disciplined, yelled at, and disparaged Plaintiff and minority trainers, and did not do the same for the white trainers. She ordered minority trainers to do menial tasks, including cleaning the salon, that she did not order white trainers to do.

53.     Meanwhile, Manger Weber was extremely friendly to and socialized with the white trainers and praised them, while ignoring Plaintiff and the minority trainers or being cold and distant to them.

54.     Manager Weber was particularly hostile to one minority trainer, criticizing her for the way she looked in her uniform, and disparaging her looks and dress to other trainers, telling them that this trainer was "lazy" and "unpleasant-looking."

55.     Upon information and belief, Manager Weber did not want Plaintiff or the minority trainers in the studio because she believed the minority employees were not "on brand"

with Defendant' "look."   Upon information and belief, Manager Weber used "on brand" as a euphemism for "white."

56.     Upon information and belief, a majority of Defendants' clients at the Saks Fifth Avenue location were wealthy white women, and Manager Weber did not think that Plaintiff and minority trainers could serve white clients.

**Plaintiff Reports the Hostile Work Environment to Supervisor Davis**

57.     In or about August 2018, Supervisor Davis ordered Plaintiff, who was a Spanish speaker, to not speak Spanish at work, saying that Manager Weber stated that the use of the Spanish language made clients "uncomfortable."

58.     Plaintiff told Supervisor Davis that she almost never spoke Spanish at work, she only occasionally spoke to a Spanish colleague about her health or other private issues. Supervisor Davis reiterated that she was not to speak Spanish.

59.     Plaintiff was extremely offended and reported to Supervisor Davis that Manager Weber created a hostile work environment for her, scrutinizing her and degrading her. Plaintiff also added that the way Manager Weber treated her was typical of the way she treated the minority trainers as well.

60.     Plaintiff stated: "I don't understand why she keeps speaking to me like this, is it because I'm not white?"

61.     Supervisor Davis simply said to Plaintiff vaguely "I don't know," and changed the subject immediately, dismissing Plaintiff's report of discrimination.

62.     Upon information and belief, Supervisor Davis told COO Pye and/or Manager Weber of Plaintiff's report of discrimination.

**Manager Weber Discriminates Against Minority Clients and "Influencers"**

63.    Plaintiff observed that Manager Weber was openly hostile to minority clients when they came into the salon.

64.    When minority clients asked about Defendant' services at the salon, or looked Defendant' products, Manager Weber looked visibly annoyed, and rolled her eyes at the clients. Upon information and belief, Manager Weber did not believe that minority clients were worthy customers of Defendant.

65.    In addition, Plaintiff gave Manager Weber a list of extremely high-profile minority Instagram "influencers" to contact in order to request that they promote Defendant' products; "influencers" are social media users who have millions of followers, and provide significant exposure for a product or service on the web. Manager Weber looked at the list of minority "influencers" and said she didn't think they were "right" for Defendant. Upon information and belief, Defendant used primarily white "influencers" to market Defendant' services, and refused to use minority "influencers."

66.    Also upon information and belief, Defendant gave minority customers and minority "influencers" significantly fewer free, complementary treatments than white customers and "influencers" at the salon.

**Defendant Deny Minority Trainers More Expensive Trainings and Wealthy Clients
Because of Their Race**

67.    Plaintiff observed that at Defendant' minority trainers were not given the same training opportunities as white trainers.

68.    White trainers were trained in the more expensive services while minority trainers were trained in less expensive services which resulted in their receiving lower tips and less opportunities for promotion and growth within the company.

69.     She also saw that Manager Weber gave white trainers more high-profile and wealthy clients, and did not do the same for minority trainers. Because Plaintiff was responsible for scheduling clients, she saw Manager Weber repeatedly walk to the front desk where Plaintiff was scheduling clients, and scheduled high-profile and wealthy clients for appointments with the two white trainers, and not the minority trainers. In fact, Manager Weber rearranged the entire salon schedule just to ensure that high-profile and wealthy clients received the white trainers.

70.     This resulted in minority trainers receiving lower tips and less opportunities for promotion and growth within the company.

71.     Upon information and belief, more expensive services were sold to more wealthy and high profile clients. Also, upon information and belief, Manager Weber believed that the wealthy people who could afford the most expensive treatments were white and would prefer to have white people touch them on their face.

**Defendant Refuse to Provide Make-up in Shades for Minority Women**

72.     Plaintiff also observed that Defendant purposefully failed to carry products necessary to service minorities.  The darkest color makeup that Defendant offered was designed for people with neutral or olive skin tones.

73.     Plaintiff and minority trainers constantly discussed this lack of makeup for minority customers.

74.     It was extremely uncomfortable for Plaintiff and the minority trainers to explain to minority customers that they did not have make-up for their skin tones. Manager Weber and Supervisor Davis told Plaintiff and the minority trainers to say the darker shaded make-up was "coming soon."

75.     Plaintiff reported to COO Pye that it was discriminatory to not have make-up for minority women, and informed her, though she had to have already known, that minority customers could not be properly serviced, and asked when and whether Defendant would be getting in more make-up styles.

76.     COO Pye told Plaintiff with an annoyed look that they were "looking into it."

77.     Plaintiff also reported to Supervisor Davis that this lack of makeup for minority customers was discriminatory. Supervisor Davis also gave Defendant' company line - that they there were "looking into it." Upon information and belief, both COO Pye and Supervisor Davis knew that Defendant Founder Inge Theron would never be introducing make-up for women of color because she did not want women of color as her customers.

**Defendant' Founder Makes Explicitly Racist Comments**

78.     In or about November 2018, Plaintiff was at a company dinner and Defendant Founder Theron asked a group of employees what she could do to make Defendant "better." Employees told her that the make-up did not cater to all skin tones, and that Defendant should provide make-up tones for everyone.

79.     Defendant Founder Theron looked astonished, and replied "I had no idea that I had black customers."

80.     Defendant Founder Theron specifically announced that she did not want to and would not provide makeup for minority women, stating "Why should I get more skin tones? I don't want those kind of customers in my store" and "I didn't know that black people [even] came into my store."

81.     Defendant Founder Theron also complained about American people, and criticized her American employees for being "not as loyal [to her and FaceGym] compared to her employees in the UK."

82.     Upon information and belief, Defendant Founder Theron told COO Pye and Manager Weber of the minority employees' report that Defendant' make-up line was racially discriminatory.

83.     Upon information and belief, Defendant Founder Theron and Defendant continue to refuse to provide makeup for minorities.

**Defendant Continue Implementing a Racist, Hostile Work Environment**

84.     The discrimination and harassment against Plaintiff and other minority employees, trainers and customers continued unabated

85.     In fact, upon information and belief, not only did this discrimination continue, but Defendant Founder Theron directed that COO Pye not hire and terminate minority employees across Defendant' salons.

86.     Upon information and belief, COO Pye told Manager Elizabeth Ruiz not to hire and to fire minority employees at the Bond Street salon.

**Plaintiff Meets with Supervisor Davis and Co-Worker Castillo**

87.     At the front-of-house, Plaintiff worked with Nelkis Castillo (hereinafter "Co-worker Castillo"), who worked under her.

88.     Co-worker Castillo frequently made mistakes scheduling clients, and as a result Plaintiff would have to deal with upset clients as she attempted to fix the scheduling.

89.     Plaintiff frequently made both Co-worker Castillo and Supervisor Davis aware of the issues Co-worker Castillo was having with properly scheduling clients. Supervisor Davis

offered no help and Plaintiff continued having to deal with the same issues created by Co-worker Castillo. In fact, Supervisor Davis seemed to not understand Plaintiff and Co-worker Castillo's different roles as front-of-house staff. On several occasions, Supervisor Davis assigned Co-worker Castillo various managerial tasks, which were clearly among Plaintiff's duties, that Co-worker Castillo did not know how to complete.

90.     Plaintiff knew many employees at the Saks Fifth Avenue location had issues with Supervisor Davis' distant, and often confusing, management style, and she was beginning to see why.

91.     On December 3, 2018, Plaintiff was scheduled to attend a meeting with Co-worker Castillo and Supervisor Davis.

92.     At this meeting, Plaintiff hoped to address the issues Co-worker Castillo had been having scheduling clients, and clear up the confusion Supervisor Davis seemed to have about the roles of front-of-house staff.

93.     Plaintiff was upset to find that from the start of the meeting, Supervisor Davis immediately began cutting her off and talking over her.

94.     Plaintiff continued trying to explain the issues Co-worker Castillo was causing at the front-of-house, but Supervisor Davis bizarrely began blaming Plaintiff, and abruptly stated that she would be leaving Defendant.

95.     Just as this happened, COO Pye entered the Saks Fifth Avenue location and asked to speak with Supervisor Davis and Co-worker Castillo outside.

### Plaintiff is Terminated from Defendant

96.     When COO Pye returned, she would not listen to Plaintiff's attempts to explain the situation and bizarrely demanded that they leave the salon and meet at a Starbucks nearby.

97.     Upon information and belief, COO Pye demanded Plaintiff leave the Saks Fifth Avenue location with her because she planned on illegally terminating Plaintiff, and wanted to do so away from other employees.

98.     At the Starbucks, COO Pye began talking over and refusing to listen to Plaintiff. She bizarrely began blaming her for any front-of-house issues. COO Pye then proceeded to claim that all of the staff had made complaints about her, but would not name any specific employees. Plaintiff was baffled by this false claim, as she knew many of the staff at Defendant trusted and confided in her.

99.     Plaintiff was shocked at how unprofessional and hostile COO Pye was to her, and could not understand how the issues she hoped to resolve in the meeting could merit such a harsh response. In her several years of management experience, Plaintiff had never seen someone treat an employee who worked under them so unprofessionally. Plaintiff began to realize that COO Pye was looking for any reason to fire her.

100.    Sure enough, before Plaintiff could get a word in about the meeting that COO Pye had interrupted, COO Pye terminated Plaintiff.

101.    Upon information and belief, Defendants were aware of Plaintiff's complaint of discrimination not more than four months prior to her termination and terminated her in retaliation for her complaint.

102.    Upon information and belief, Defendant Inge Theron had learned that there were people of color working at the Saks Fifth Avenue Location, and wanted them all fired.

103.    In fact, upon information and belief, and as alleged in the law suit Elizabeth Ruiz v. Facegym et al., COO Pye told Studio Manager Elizabeth Ruiz that she should only hire white

people to work at the front desk, that she should fire non-white employees at the front desk, and in the future only hire white people to work at Defendant (Case Index No. 157560/2019)**.**

104.     Upon Information and belief, Plaintiff was terminated because of her skin color, and because she reported harassment and discrimination to Defendant.

## FIRST CAUSE OF ACTION

*(Race and National Origin Discrimination in Violation of New York State Human Rights Law and the New York City Human Rights Law)*

105.     Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

106.     Defendants and FaceGym Founder Theron have discriminated against Plaintiff in violation of the New York State Human Rights Law and the New York City Human Rights Law by subjecting her to different treatment on the basis of her race and/or national origin. Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendants and FaceGym Founder Theron's wrongful conduct.

107.     Defendants and FaceGym Founder Theron have discriminated against Plaintiff by treating her differently from and less preferably than white individuals and by subjecting her to disparate terms and conditions of employment, and other forms of discrimination in violation of the New York State Human Rights Law and the New York City Human Rights Law.

108.     Defendants and FaceGym Founder Theron's conduct has been intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages under the New York City Human Rights Law.

109.     By reason of Defendants and FaceGym Founder Theron's discrimination, Plaintiff is entitled to all remedies available for violations of the New York State Human Rights Law and the New York City Human Rights Law.

110.    As a result of FaceGym Founder Theron and Defendants' violation of 42 U.S.C. § 1981, the New York State Human Rights Law and New York City Human Rights Law, Plaintiff has been damaged in the sum of no less than $1,000,000.

## SECOND CAUSE OF ACTION
*(Retaliation in Violation of New York State Human Rights Law and New York City Human Rights Law)*

111.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

112.    Plaintiff was an employee of Defendants and FaceGym Founder Theron and is protected by the New York State Human Rights Law and New York City Human Rights Law from retaliation and retaliatory discharge.

113.    Plaintiff complained to Defendants and FaceGym Founder Theron about the race discrimination she was subjected to during her employment with Defendants.

114.    Plaintiff's complaints were ignored and discouraged by Defendants' managerial employees in violation of the New York State Human Rights Law and New York City Human Rights Law.

115.    Plaintiff's protest to Defendants about the race and national origin discrimination she was subjected to during her employment with Defendant was a protected activity under the New York State Human Rights Law and City Human Rights Law.

116.    Defendants and FaceGym Founder Theron, unlawfully and without cause, retaliated against Plaintiff as a direct result of Plaintiff complaining about the incidents of race and national origin discrimination.

117.    Because she protested Defendants and FaceGym Founder Theron's unlawful behavior, Plaintiff was subjected to retaliation, and she was terminated.

118.    The retaliation substantially interfered with the employment of Plaintiff and created an intimidating, offensive, hostile and hostile work environment in violation of the New York State Human Rights Law and New York City Human Rights Laws.

119.    Defendants knew or should have known about the retaliation and the affect it had on Plaintiff's employment but failed to take any action to stop the retaliatory conduct.

120.    As a direct and proximate result of said unlawful employment practices and disregard for Plaintiff's rights and sensibilities, Plaintiff has lost and will continue to lose substantial income including, but not limited to wages, social security, and other benefits due her.

121.    Additionally, Plaintiff has suffered the indignity of discrimination and retaliation, the invasion of her rights to be free from discrimination, and great humiliation, which has manifested in serious emotional stress and physical illness.

122.    As a further direct and proximate result of said unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future and her ability to support herself and her family, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her good reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

123.    As a result of Defendants' violation of the New York State Human Rights Law and New York City Human Rights Law, Plaintiff has been damaged in the sum of no less than $1,000,000.

### THIRD CAUSE OF ACTION
*FLSA – Failure to Pay Overtime*

124.     Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

125.     Plaintiff is a non-exempt employee entitled to be paid overtime compensation for all overtime hours worked.

126.     Defendants employed Plaintiff for work weeks longer than 40 hours and willfully failed to compensate Plaintiff for all of the time worked in excess of 40 hours per week, at a rate of at least one and one-half times their regular hourly rate, in violation of the requirements of Section 7 of the FLSA, 29 U.S.C. § 207(a)(1).

127.     Plaintiff has expressed her consent to make these claims against Defendants by signing a written consent form, pursuant to 29 U.S.C. § 216(b). See Ex. A.

128.     Defendants failed to make a good faith effort to comply with the FLSA with respect to its compensation to Plaintiff.

129.     Because Defendants' violations of the FLSA were willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. § 255.

130.     As a consequence of the willful underpayment of wages, alleged above, Plaintiff incurred damages thereby and Defendants are indebted to her in the amount of the unpaid overtime compensation, together with interest, liquidated damages, attorneys' fees, and costs in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
*NYLL – Unpaid Overtime*

131.     Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

132.    Defendants employed Plaintiff for workweeks longer than 40 hours and willfully failed to compensate Plaintiff for all of the time worked in excess of 40 hours per week, at a rate of at least 1 and 1⁄2 times their regular hourly rate, in violation of the requirements of NYLL.

133.    By the course of conduct set forth above, Defendants have violated NYLL § 650, *et seq.*; 12 N.Y.C.R.R. Part 142-2.2.

134.    Defendants failed to keep, make, preserve, maintain and furnish accurate records of time worked by Plaintiff.

135.    Defendants have a policy and practice of refusing to pay overtime compensation for all hours worked over 40 per workweek to Plaintiff.

136.    Defendants lacked a good faith basis, within the meaning of N.Y. Lab. Law § 663, to believe their failure to pay Plaintiff overtime wages complied with the NYLL.

137.    As a consequence of Defendant's lack of good faith for the underpayment of Plaintiff's wages, alleged above, Plaintiff incurred damages thereby and Defendant are indebted to them in the amount of the unpaid overtime compensation and such other legal and equitable relief due to Defendant's unlawful and willful conduct, as the Court deems just and proper.

138.    Plaintiff seeks recovery of liquidated damages, attorneys' fees, and costs to be paid by Defendants as provided by the NYLL.

### FIFTH CAUSE OF ACTION
*NYLL – Unpaid Non-Overtime Wages*

139.    Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

140.    Plaintiff was entitled to her regular hourly wage for each hour she worked for Defendants up to and including 40 hours per week.

141.    Defendants employed Plaintiff and willfully failed to compensate Plaintiff at their regular hourly rate for the time spent working up to and including 40 hours per week, in violation of the requirements of N.Y. Lab. Law § 661(3).

142.    The complete records concerning the number of hours worked by Plaintiff as well as the compensation Plaintiff received in workweeks in which unpaid hours were worked are in the exclusive possession and control of Defendants, and as such, Plaintiff is unable to state at this time the exact amount due and owing to her.

143.    By the course of conduct set forth above, Defendants violated N.Y. Lab. Law § 650, et seq.

144.    Defendants failed to keep, make, preserve, maintain, and furnish accurate records of time worked by Plaintiff.

145.    Defendants have a policy and practice of refusing to pay overtime compensation for all hours worked to Plaintiff.

146.    Defendants' failure to pay compensation to Plaintiff was willful within the meaning of N.Y. Lab. Law § 663.

147.    As a consequence of the willful underpayment of wages, alleged above, Plaintiff incurred damages thereby and Defendants are indebted to them in the amount of the unpaid wages and such other legal and equitable relief due to Defendants' unlawful and willful conduct, as the Court deems just and proper.

148.    Plaintiff seeks recovery of liquidated damages, interest, attorneys' fees, and costs to be paid by Defendants as provided by the NYLL.

## SIXTH CAUSE OF ACTION
*NYLL – Failure to Provide Accurate Wage Statements*

149.    Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

150.    Defendant failed to supply Plaintiff with an accurate statement of wages with every payment of wages as required by NYLL § 195(3), listing: dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; hourly rate or rates of pay and overtime rate or rates of pay if applicable; the number of hours worked, including overtime hours worked if applicable; deductions; and net wages.

151.    Due to Defendant's violations of NYLL § 195(3), Plaintiff is entitled to statutory penalties of two hundred fifty dollars for each workday that Defendant failed to provide him with accurate wage statements, or a total of five thousand dollars each, and reasonable attorneys' fees and costs, as provided for by NYLL § 198 (1-d).

## SEVENTH CAUSE OF ACTION
*NYLL – Failure To Provide Wage Notice*

152.    Plaintiff incorporates by reference all allegations in all preceding paragraphs.

153.    Defendants failed to supply Plaintiff notice as required by N.Y. Lab. Law § 195, in English or in the language identified by Plaintiff as her primary language, containing Plaintiff's rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; hourly rate or rates of pay and overtime rate or rates of pay if applicable; the regular pay day designated by the employer in accordance with N.Y. Lab. Law §

22

191; the name of the employer; any "doing business as" names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if different; the telephone number of the employer; plus such other information as the commissioner deems material and necessary.

154.     Due to Defendants' violations of N.Y. Lab. Law § 195, for each workweek that Defendants failed to provide a proper wage notice at the time of hiring from April 9, 2011 through February 26, 2015, Plaintiff is each entitled to damages of $50 per work week, or a total of $2,500, as provided for by N.Y. Lab. Law § 198, reasonable attorneys' fees, costs, and injunctive and declaratory relief.

155.     Due to Defendants' violations of N.Y. Lab. Law § 195, for each day that Defendants failed to provide a proper wage notice at the time of hiring from February 26, 2015 through the present, Plaintiff is entitled to damages of $50 per work day, or a total of $5,000, as provided for by N.Y. Lab. Law § 198, reasonable attorneys' fees, costs, and injunctive and declaratory relief.

## RELIEF DEMANDED

**WHEREFORE**, the Plaintiff respectfully requests that this Court enter judgment:

A:      Declaring that FaceGym Founder Theron, Defendants and its managerial employees engaged in unlawful retaliation in violation of state and local statutes cited herein.

B:      On the first cause of action, compensatory and punitive damages in the amount of ONE MILLION DOLLARS ($1,000,000.00).

C:      On the second cause of action, compensatory and punitive damages in the amount of ONE MILLION DOLLARS ($1,000,000.00).

D:      On the third cause of action, unpaid overtime pay and liquidated damages permitted by law pursuant to the FLSA in an amount to be determined at trial.

E.      On the fourth cause of action, unpaid overtime pay and liquidated damages permitted by law pursuant to the NYLL in an amount to be determined at trial.

F.      On the fifth cause of action, unpaid wages and liquidated damages permitted by law pursuant to the NYLL in an amount to be determined at trial.

G.      On the sixth cause of action, statutory damages, as provided for by NYLL § 198 for Defendants' violation of wage statement requirements pursuant to NYLL § 195 in the amount of FIVE THOUSAND DOLLARS ($5,000)

H.      On the seventh cause of action, statutory damages, as provided for by NYLL § 198 for Defendants' violation of wage notice requirements pursuant to NYLL § 195 in the amount of FIVE THOUSAND DOLLARS ($5,000)

I.      The pre-judgment interest and post judgment interest, cost, disbursements and legal fees of this action and attorney's fees.

K:      Such other and further relief as this Court may deem just and proper under the circumstances.

Dated: New York, NY
        May 18, 2020

                                    Respectfully Submitted,

                                    GODDARD LAW, PLLC
                                    *Attorneys for Plaintiff*

                          By:     */s/ Megan S. Goddard*
                                    Megan S. Goddard, Esq.
                                    39 Broadway, Suite 1540
                                    New York, NY 10006
                                    Office: 646-504-8363